UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                      Criminal No. 07-421 (JNE/FLN)

        Plaintiff,

        v.                                                              **REPORT AND**
                                                                **RECOMMENDATION**

Ray James Brown,

        Defendant.

_____

Erica MacDonald, Assistant United States Attorney, for the Government.
William G. Selman III, Esq., for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on December 12, 2007, on Defendant's Motion to Suppress Evidence as a Result of Search and Seizure [#19] and Defendant's Motion to Suppress Statements [#20].  At the hearing, the Court received testimony from Minneapolis Police Officer Michael Griffin ("Officer Griffin").  Neither party submitted any exhibits during the course of the hearing.  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons which follow, this Court recommends Defendant's Motions be **DENIED**.

## I.   FINDINGS OF FACT

Officer Griffin has been a police officer with the City of Minneapolis for approximately one year.  (Tr. at 5.)  Prior to becoming a police officer, he received a two-year degree in law enforcement from Inver Hills Community College and worked as a public safety officer at the University of St. Thomas for almost three years.  (Tr. at 6.)

Officer Griffin testified that on August 28, 2007, he was working the 6:00 a.m. to 4:00 p.m. shift as a patrol officer in north Minneapolis.  (Tr. at 7.)  At approximately 12:08 p.m. he stated that he and his partner, Officer John Chamberlain, were driving southbound on 4th Street in their marked squad car when he observed a vehicle traveling eastbound on 27th Street run the stop sign at the intersection of 4th Street and 23rd.  (Tr. at 8-9.)  He testified that the car turned left onto 4th Street and started traveling northbound.  (*Id.*)  Officer Griffin made a U-turn on 4th Street, drove up behind the vehicle, and had his partner run the plates on the vehicle.  He testified that he and his partner run the plates on all vehicles before they pull them over to give them an idea of what they might encounter when they pull the car over.   The car, a Dodge Charger, was registered to a female in Iowa.  (Tr. at 11.)  Officer Griffin decided to pull the car over for running the stop sign.  (Tr. at 10.)

He testified that he pulled the car over by activating his lights and then he and his partner approached the Charger, he on the driver's side and Officer Chamberlain on the passenger side. (Tr. at 11-12.)  He stated that there were four occupants in the car.  (Tr. at 34.)  He noticed that the driver appeared very nervous, would not make eye-contact, was stumbling with his words, fidgeting in his seat and was looking at the other passengers for confirmation on the answers to questions the officer asked.  (*Id.*)  He testified that all of the occupants were looking around as if they were looking for a place to run.  (Tr. at 40.)

Officer Griffin testified that he asked the driver the same questions he asks of all drivers he pulls over.  (Tr. at 12-13.)  Officer Griffin asked the driver where he was going, to which he responded a cousin's house near the intersection of 29th and Dupont, but he said he could not give Officer Griffin an exact address.  (Tr. at 13.)  When Officer Griffin asked if he knew the

other individuals in the car, the driver said that he did not know them, a response that the officer found suspicious. (*Id*.) Officer Griffin testified that the driver truthfully stated that the car belonged to his mother. (*Id*.)

Officer Griffin testified that at that point, he asked all of the occupants for identification, a procedure he follows on all traffic stops. (Tr. at 14.) The Defendant was seated in the front passenger seat. (*Id*.) Three of the four passengers, including the driver and the Defendant, produced a drivers license or Minnesota ID card, and the officers ran them through the computer. Officer Griffin testified that the rear passenger side passenger did not initially produce an identification card, but his partner somehow learned the individual's name, which Officer Chamberlain ran through the computer and learned that the individual had a juvenile misdemeanor warrant out for his arrest. (Tr. at 38-39.) Officer Griffin stated that, at that point, he and his partner decided that Officer Chamberlain would arrest the rear passenger seat occupant for the outstanding warrant. He testified that the other occupants' records were clear. (Tr. at 39.)

He testified that while Officer Chamberlain was performing the arrest, Officer Griffin asked the driver if there was anything illegal in the vehicle and the driver responded that there was not. (Tr. at 15.) Officer Griffin told the driver that he was free to go but asked the driver for permission to search the vehicle before he left. (Tr. at 16.) Officer Griffin stated he asked to search the vehicle because he was suspicious of the occupants' nervousness and the driver's evasive answers to his questions, including his statement that he did not know the names of anyone else in the car. (Tr. at 41.) Officer Griffin did, however, acknowledge that it was not unusual for young black men to become nervous when they are stopped by the police in north

Minneapolis.  (*Id.*)

The driver gave him permission to search the vehicle and so Officer Griffin requested that the driver get out of the car.  (Tr. at 17.)  Officer Griffin testified that when he and his partner search a vehicle with more than two passengers, they ask the passengers to exit the car individually to search them for weapons and then search the vehicle after they ascertain that none of the occupants has weapons and that they are under control.  (Tr. at 49.)

Officer Griffin stated that at the time the driver began to step out of the car, he noticed the Defendant opening the passenger side door.  (*Id.*)   Officer Griffin testified that he told the Defendant to "[s]tay in the vehicle.  Close the door."  (*Id.*)  He testified that the Defendant ignored the order and ran from the vehicle eastbound through a yard.  (*Id.*)  Officer Griffin stated that he ran after the Defendant and commanded him to stop running.  (Tr. at 18.)  He testified that he ran after the Defendant because it is a crime to flee an officer and that in his experience, when an individual flees, they likely have a weapon or have committed a crime.  (Tr. at 50.)

Officer Griffin stated that he was running behind the Defendant at an angle so he could observe the Defendant's hands.  (Tr. at 18.)  Officer Griffin testified that he noticed the Defendant was digging into his front waistband with his right hand.  (Tr. at 19.)  At that point, Officer Griffin removed his firearm from the holster because he believed the Defendant was searching for a weapon.  (Tr. at 19.)  He testified that they continued running through the yard of a house on 4th Street, to the alley until he was able to take down the Defendant in the front yard of a house on 3rd Street.  (Tr. at 43.)  Officer Griffin estimated that the chase lasted about 30 to 40 seconds.  (Tr. at 20.)

Officer Griffin stated that once he brought the Defendant to the ground, the Defendant

was moving aggressively in an attempt to get away from the officer.  Officer Griffin was
ultimately able to get both of the Defendant's hands behind his back.  (Tr. at 22.)   Before
handcuffing the Defendant, Officer Griffin picked him up to move the Defendant away from the
location where he was brought down because he suspected that there was a gun hidden under the
Defendant or in his waistband.  (*Id*.)  After he moved the Defendant, Officer Griffin noticed a
gun laying on the ground.  (*Id*.)  Officer Griffin testified that he handcuffed the Defendant about
three feet away from where he picked the Defendant up.  (*Id*.)  At that point, Officer Aaron
Collins arrived and assisted Officer Griffin with removing the Defendant from the scene.  (Tr. at
22-23.)

Officer Griffin testified that as the Defendant was being taken away from the scene, he
was yelling profanities at Griffin and telling him that he was lucky.  (Tr. at 23.)  Officer Griffin
stated that the Defendant's comments were not in response to anything the officer said to the
Defendant; Officer Griffin testified that he was not questioning the Defendant at all.  (*Id*.)  The
Defendant was eventually placed in the rear of a squad car and the squad drove back to 4th Street
where the officers originally pulled over the car.  (Tr. at 24.)  Officer Griffin testified that he
walked back to 4th Street and when he arrived, the Defendant continued to yell from the back of
the squad car that Officer Griffin was lucky; that the Defendant was going to kill him; that he
was in a gang.  (*Id*.)  Officer Griffin stated that during this time, he was not questioning the
Defendant.  (*Id*.)

## II.  CONCLUSIONS OF LAW

### A.  Defendant's Motion to Suppress Evidence as a Result of Search and Seizure Must Be Denied [#19]

Defendant seeks to suppress the gun that was seized from him following a foot chase that he initiated after the driver of the car in which he was a passenger consented to a search of the car.  The Court concludes that the gun was seized incident to a lawful arrest of the Defendant for fleeing a police officer.

### 1.  Officer Griffin Had Probable Cause to Make the Initial Traffic Stop.

Defendant concedes that Officer Griffin had probable cause to make the initial traffic stop when the driver of the car in which Defendant was a passenger ran a stop sign.  After identifying the occupants of the car and arresting a juvenile passenger, for whom there was an outstanding arrest warrant, Officer Griffin decided to end the traffic stop without issuing a ticket, even though his suspicions had been aroused by the conversation with the driver.  He told the driver he was free to go.  But to address his suspicions, he asked the driver for consent to search the car, which the driver granted.

### 2.  By the Time He Caught the Defendant, Officer Griffin Had Probable Cause to Arrest Him For Fleeing a Police Officer.

The gun that is the subject of the suppression motion was seized by Officer Griffin when he arrested Defendant at the end of the foot chase, begun by Defendant as Officer Griffin prepared to search the car in which Defendant was a passenger. The lawfulness of the gun seizure here turns on whether Officer Griffin had probable cause to arrest the Defendant for fleeing a police officer; if so, the gun was seized incident to that lawful arrest.  The Government contends that the Defendant was lawfully arrested for fleeing a police officer.  Such flight is a

crime, however, only if done for the purpose of evading an investigation and the flight was from

a police officer acting in lawful discharge of an official duty. *See* Minn. Stat. § 609.487 subd. 6.

If Officer Griffin did not have a reasonable suspicion to chase and tackle the Defendant, he was

not acting in the lawful discharge of an official duty, and Defendant's flight was not a crime.

The first question, therefore, is whether at the time he ordered the Defendant to stop, Officer

Griffin had a reasonable suspicion that the Defendant was involved in some criminal activity.

While not entirely free of doubt, we conclude that Officer Griffin did have a reasonable

suspicion. The Supreme Court has never held that unprovoked flight alone can constitute

reasonable suspicion to justify a *Terry* stop.[1] In *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000),

the Supreme Court held that unprovoked flight from the police, when coupled with presence in

an area known for high narcotics trafficking at a time when a caravan of police arrived precisely

to investigate narcotics trafficking, constituted reasonable suspicion.

The question of whether Officer Griffin had a reasonable suspicion here is a close one.

When Officer Griffin ran the car's license plates, he discovered the owner of the vehicle was a

female from Iowa. The driver's answer to the question regarding the owner of the car was

consistent with what Officer Griffin learned from the motor vehicle database - that the driver's

mother owned the car. Both the driver and the Defendant provided identification when asked

---

[1]Indeed, in *California v. Hodari D.*, 499 U.S.621,623 n.1 (1991), California conceded
that flight alone did not give rise to reasonable suspicion. In a footnote, Justice Scalia accepted
the concession, but questioned the wisdom of it, quoting from the biblical *Book of Proverbs*,
"The wicked flee when no man pursueth." Nearly a century earlier, however, the Supreme Court
had expressly held, in the context of reviewing a jury instruction, that it was reversible error to
suggest that this precise proverb compelled the jury to infer guilt from flight alone. *Alberty v.
United States.*, 162 U.S. 499 (1896) ("nor is it true as an accepted axiom of criminal law that the
wicked flee when no man pursueth, but the righteous are as bold as a lion."). See also, *Hickory
v. United States*, 160 US 408 (1896).

7

and the officer had no reason to suspect either was not who they said they were.  While the juvenile in the back passenger seat had an outstanding warrant and was arrested on that warrant, there is no evidence that the Defendant was aware of the juvenile's warrant or was in any way involved in the juvenile's criminal activity; indeed, there was no evidence at the hearing regarding the crime for which the warrant was issued.  The officer did not cite the driver for running the stop sign and told the driver he was free to go but also asked if he could search the car before the driver left.  While the driver consented to the search, he could have revoked that consent at any time.

On the other hand, when Officer Griffin asked the driver  who the other passengers were, the driver said he did not know.  The driver also acted nervous by looking around for confirmation regarding the answers he was providing to Officer Griffin.  The Driver also gave an evasive answer when asked where they were going; he told the officer they were going to his cousin's house but he was unable to give the precise address.  Moreover, unlike in *Hodari D.* and *Wardlow*, the Defendant's flight was not entirely without provocation; it appears to have been provoked by the driver's consent to search the vehicle.  In addition, during the chase, Officer Griffin reasonably believed the Defendant was reaching for a weapon in his waistband.  Under all of these circumstances, we conclude Officer Griffin had a reasonable suspicion to conduct a *Terry* stop to further investigate whether Defendant was engaged in criminal activity.

As Officer Griffin was acting in the lawful discharge of an official duty, and as Defendant's flight was to avoid such an investigation, Officer Griffin had probable cause to arrest the Defendant for fleeing a police officer.  Minn. Stat. Section 609.487 subd. 6.   The gun

was found and seized incident to a valid arrest for fleeing a police officer.

**B.  Defendant's Motion to Suppress Statements [#20]**

The Defendant contends that his statements made to Officer Griffin should be suppressed because he was not read his *Miranda* rights.  "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers."  *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996).  In this case, the Defendant ran from a car as Officer Griffin yelled repeatedly for him to stop.  Officer Griffin eventually apprehended the Defendant and handcuffed him.  Officer Griffin testified that during the chase and the arrest, he did not ask the Defendant any questions.  While he was being chased and arrested, the Defendant yelled profanities and threats and told the officer that he was in a gang and that the officer was lucky to have caught the Defendant this time.  The Court finds credible Officer Griffin's testimony that he did not ask the Defendant any questions and that the Defendant voluntarily hurled insults and threats.

The Defendant argues that Officer Griffin's actions were "reasonably likely to elicit an incriminating response" from the Defendant.  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  In making this argument, Defendant cites to *Dickerson v. United States*, 530 U.S. 428, 434 (2000) for the proposition that in making its determination on whether or not a confession was voluntary, a court must examine "whether a defendant's will was overborne by the circumstances surrounding the giving of the confession."  In this case, Officer Griffin was executing a routine traffic stop and requested to search the vehicle.  None of the officer's actions were likely to elicit an incriminating response and none of his actions overbore the Defendant's will.  The Defendant was breaking the law by fleeing a police officer and after being

9

apprehended, made threatening comments to the officer without provocation.  It is apparent,

based on Officer Griffin's credible testimony, that the Defendant's statements were voluntary.

Therefore the Court recommends that Defendant's motion to suppress the statements be denied.

## III.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that Defendant's motions to suppress evidence [#19] and to suppress

statements [#20] be **DENIED**.


DATED: January 11, 2008                          s/ *Franklin L. Noel*
                                                 FRANKLIN L. NOEL
                                                 United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 31, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **January 31, 2007,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.